**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 09:19 AM October 2, 2012**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| IRENE M. STARR, | ) | CASE NO. 09-64079 |
| | ) | |
| Debtor. | ) | ADV. NO. 10-6007 |
| | ) | |
| ADVANTAGE BANK, | ) | JUDGE RUSS KENDIG |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OF OPINION (NOT** |
| v. | ) | **INTENDED FOR PUBLICATION)** |
| | ) | |
| IRENE M. STARR, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

   This adversary proceeding arises in the chapter 7 bankruptcy proceeding of Irene M. Starr. Advantage Bank filed its complaint on February 1, 2010 seeking a judgment of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A) and (B) and § 523(a)(6) and a denial of discharge pursuant to 11 U.S.C. § 727(a)(2)-(7). The matter came before the court for trial on July 23 and 24, 2012 and the parties each filed post-trial briefs on August 6, 2012.

   The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and the general order of reference entered in this district on April 4, 2012. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I)

1

and (J). In accordance with Fed. R. Bankr. P. 7052, the court's findings of facts and conclusions of law are set forth in this memorandum.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## **FINDINGS OF FACT**

Based on the record as constructed at trial, the court finds the following facts to be established:

Irene Starr ("Defendant" or "Starr") is the debtor in the chapter 7 case under which this adversary arises. Defendant was a co-owner of an entity known as Barrington Framing Company ("Barrington" or "Company") with her business partner, Ronald Duplain ("Duplain").[1] Defendant has been a licensed realtor since 1995 and has experience with bookkeeping. Defendant purchased undeveloped real estate, later named Gray Ridge Estates ("Gray Ridge") and located in the City of Massillon, for over $250,000.00 using personal assets arising from her divorce with Chris Starr, and deeded Gray Ridge to Barrington so that it could develop the land into single family residential lots. Gray Ridge was to contain 86 lots in total and be developed in three phases.

In order to finance the development of Gray Ridge, on October 12, 2005, Advantage Bank ("Plaintiff" or "Bank") furnished a line of credit to Barrington in an amount up to $975,000.00 ("loan" or "line of credit") at an initial interest rate of 7.75%[2] and in exchange Barrington gave Plaintiff a first mortgage on Gray Ridge as evidenced by the promissory note.[3] Defendant and Duplain personally guaranteed the line of credit that Plaintiff furnished to Barrington. Under the terms of the loan, the outstanding principal was due in full by October 1, 2007 and Barrington was to make regular monthly payments of accrued unpaid interest beginning November 1, 2005. Further, the original loan provided for two (2) six-month extensions of the loan, if needed, at a cost of one-quarter percent per extension.

When providing the loan to Barrington, Plaintiff collected information regarding, *inter alia*, personal financial statements of Barrington and both guarantors, Starr and Duplain. The personal financial statements included information regarding assets (cash and bank accounts, securities, real estate, vehicles, etc.), liabilities, and net worth. Defendant signed and dated her first personal financial statement on July 13, 2005 ("original personal financial statement" or "first statement").[4] She listed assets totaling $1,809,497.00, including $160,116.00 in cash savings,

---

[1] Defendant also had ownership interests in two other entities, Homes by Barrington and I.M. Starr, Inc.
[2] Starr testified that she and Duplain believed the interest rate on the loan to be prime plus 1% and later learned that the Bank had included a provision in the loan that the interest rate would not drop below 7.5%. Despite Starr's belief, the promissory note indicates that the interest rate on the loan would not be less than 7.5%.
[3] Pl.'s Ex. B.
[4] Pl.'s Ex. C. The original personal financial statement includes a two page document titled "personal financial statement," as well as a copy of Starr's resume, an account balances report dated July 12, 2005, and a balance sheet for I.M. Starr, Inc. dated July 13, 2005.

2

$529,249.00 in real estate,[5] $525,478.00 in receivables,[6] $22,000.00 in vehicles, $11,645.00 in life insurance cash value, $65,006.00 in profit sharing plan,[7] and $496,003.00 in business ventures.[8] Defendant listed $0.00 in liabilities for a net worth of $1,809,497.00.

After Plaintiff furnished the loan to Barrington, the Company began the development of Gray Ridge. By early 2006, the project was stalling. Testimony at trial indicated that the parties dispute the cause of the delays. Plaintiff contends that the City of Massillon would not grant permits to install the sanitary lines under the roads and Defendant contends that Plaintiff would not release the roads to the City of Massillon.

Following the delays, Plaintiff's inspector determined that additional funds of $441,000.00 were necessary to complete the project and, deciding that it was insecure, Plaintiff froze any further draws on the loan in either February or March of 2006. Defendant, however, testified that the Bank did not seek the additional monies and freeze draws until July of 2006. These facts are important because the Bank asserts that Starr created a trust for certain assets, as discussed below, to shield assets from the Bank knowing that the project was going awry. Plaintiff's witnesses were unable to testify with any credible certainty as to when the Bank froze draws or when the need for additional funds arose. Defendant, on the other hand, testified that the need for additional funds arose in July 2006 and that a meeting on that issue was held at Gray Ridge in July 2006. Defendant's testimony on these issues was credible and consistent with the fact that Defendant did not provide the additional funds needed for the project until September 2006, as discussed below.

In May 2006, Defendant created a revocable trust agreement, known as the Irene M. Starr Trust ("Trust"), and placed her home, located at 1725 Fallen Timber Street NE in Canton, Ohio ("Fallen Timber") and all personal property into the Trust.[9] Defendant testified that she created the Trust to update her will that she created in 2001 and that she understood that the Trust was revocable which meant that she could put assets into the Trust and remove those assets from the Trust at her discretion.

In September 2006, the Bank requested that Barrington pay $450,000.00 to keep the line of credit open due to additional, unanticipated costs in the project. Defendant testified that Barrington borrowed the $450,000.00 from her ex-husband, Chris Starr, and signed a promissory

---

[5] Starr listed 1902 Hollythorne, valued at $385,445.00. Starr also listed 1725 Fallen Timber, valued at $143,804.00, but that figure was later crossed out and replaced with the value of $290,000.00. However, the total value of real property listed for purposes of total assets and net worth was $529,249.00, which includes the Hollythorne property at $385,445.00 and the Fallen Timber property at $143,804.00. The Court concludes that the first personal financial statement valued Fallen Timber at $143,804.00.

[6] The receivables reported for purposes of total assets and net worth were $525,478.00. On the Account Balances Report, Starr listed the receivables as $50,000.00 for "Loan 11th Street," $200,000.00 for "Loan Bill Gray," and $2,350.00 for "Loan Della O'Donnell," which total only $252,350.00 In addition, Starr listed an asset account of $286,126.14 for Barrington Framing Company that the Court cannot locate in the assets listed on page one of Exhibit C. These figures total $538,476.14, not the $525,478.00 that Starr listed in receivables.

[7] Starr listed a Prudential IRA.

[8] Starr listed her interest as President and 100% owner of I.M. Starr, Inc.

[9] Pl.'s Ex. D, E, and F. Def.'s Ex. 13 and 14.

3

note on behalf of Barrington to Chris Starr.[10] Starr also testified that she personally guaranteed to repay Chris Starr $300,000.00 when she sold real estate located at 1902 Hollythorne. At trial, the parties disputed whether or not Defendant told the Bank that Barrington borrowed the $450,000.00 from Chris Starr. Representatives from the Bank testified that Starr did not inform them that Barrington borrowed the money and that Starr led them to believe that she contributed the $450,000.00 from her personal funds. Starr testified that the Bank knew Barrington borrowed the money.

The Court found Starr's testimony to be credible on this issue. The Bank knew or should have known that Barrington borrowed the $450,000.00 that it contributed to the project in September 2006. On Starr's first personal financial statement, Starr did not have sufficient liquid assets available to personally contribute $450,000.00.[11] Her only liquid assets were $160,116.00 in cash and $65,006.00 in a retirement fund with the majority of her remaining assets in receivables, real estate, and business ventures. Unless Starr had liquidated substantial assets, which is unlikely given the time frame and the economy at this time, the only logical conclusion is that Barrington had to borrow the money.[12] The Bank never gave any credible testimony as to its belief of the source of the $450,000.00. The Bank knew the $450,000.00 had to come from somewhere.

Prior to the loan's maturity date of October 1, 2007, the Bank and Starr communicated regarding an extension of the loan for six (6) months as provided under the terms of the loan. For the Bank to consider the extension, Starr completed an updated personal financial statement, dated June 1, 2007 ("second personal financial statement").[13] Starr's second personal financial statement was in a different format from her original statement and, as submitted by the Bank, was just two pages in length with no attachments. Starr testified that she attached an additional page to the second personal financial statement, which listed the loan from Chris Starr. Starr's second personal financial statement reported assets totaling $4,079,703.00, including $226,645.00 in cash savings, $192,000.00 in marketable securities,[14] $908,503.00 in notes receivable,[15] $4,345.00 in cash value life insurance, $66,610.00 in a vested interest in retirement fund, $10,000.00 in furniture and personal property, $25,000.00 in vehicles, and $2,646,600.00 in real estate.[16] The second personal financial statement listed liabilities totaling $1,600,782.00,[17] for a net worth of

---

[10] Pl.'s Ex. G and Def.'s Ex. 4.
[11] Even if the Bank looked at Starr's second personal financial statement, discussed in detail below, to contribute $450,000.00 would have used nearly all of her liquid assets.
[12] There was no mention at trial of whether Duplain could have personally funded the $450,000.00 in whole or in part and for this reason, the Court concludes that there was no question that Duplain was not able to personally contribute the $450,000.00 to the project on behalf of Barrington.
[13] Pl.'s Ex. L.
[14] A Raymond James account with a value of $192,000.00.
[15] Starr listed receivables due from R R Stark Co. in the amount of $150,000.00, from William Gray in the amount of $200,000.00, and from Barrington Framing in the amount of $558,503.00.
[16] Defendant listed 1725 Fallen Timber valued at $310,000.00, Gray Ridge valued at $2,000,000.00, 2740 Gray Ridge (a model home for Gray Ridge) valued at $166,700.00, and 2782 Gray Ridge (a spec home for Gray Ridge) valued at $169,900.00.
[17] The liabilities include a vehicle loan in the amount of $16,279.00, the loan to the Bank of $750,000.00 (secured by Gray Ridge Estates), a mortgage held by the I. Starr Trust in the amount of $558,503.00 (secured by Gray Ridge

4

$2,478,921.00. In addition, the second personal financial statement also listed Starr's interests in Homes by Barrington and Barrington Framing and listed Starr as a co-signer on her daughter's car loan.

Also in June 2007, following the sale of Starr's Hollythorne property, Barrington had a buyer who wanted to build a house in the Gray Ridge Project, but could not get financing. Instead of paying Chris Starr the $300,000.00 Defendant had promised when Hollythorne sold, as discussed above, she testified that she paid Chris Starr $150,000.00[18] and used the other $150,000.00 to fund the new construction for the homebuyer.

In late July 2007, Barrington drew $154,809.53 on the line of credit. Plaintiff contends that when viewing the repayment of $150,000.00 to Chris Starr and this draw together, it appears that Starr caused Barrington to draw the money from the line of credit only to repay Chris Starr instead of using the money for the benefit of Gray Ridge. Starr testified that this was not the case and the court finds her testimony on this issue credible. First, there is no dispute that Starr received the $300,000.00 from the sale of Hollythorne.[19] Second, Starr was under no obligation to use the proceeds from the sale of Hollythorne to fund Gray Ridge. Therefore, her decision to pay Chris Starr with those proceeds is not related to a separate draw that Barrington made on the line of credit in the same time period.

There is no dispute that on September 18, 2007, the Bank granted the extension on the loan thereby delaying the maturity date to April 1, 2008.[20] To obtain the extension, Starr completed the second personal financial statement, discussed above, and Barrington paid the fee of $2,437.50 required under the terms of the loan for an extension. In addition, Barrington was current on all payments required under the loan at that time.

The Bank and Starr continued discussions in March 2008 regarding a further extension of the loan given the dismal sales in Gray Ridge and the approaching maturity date of the loan. At the Bank's request, Starr submitted yet another personal financial statement dated March 2008 ("third personal financial statement" or "third statement").[21] The third statement lists total assets

---

Estates), a mortgage held by Home Savings in the amount of $138,000.00 (secured by 2740 Gray Ridge), and a mortgage held by Home Savings in the amount of $138,000.00 (secured by 2782 Gray Ridge).

[18] Plaintiff's Exhibit H and Defendant's Exhibit 4 document Chris Starr's acknowledgement of repayment of $150,000.00 toward the $450,000.00 loan on June 26, 2007.

[19] The Bank contends that Starr had two mortgages on the Hollythorne property, both held by National City Bank, and presented certificates of satisfaction of these mortgages. Pl.'s Ex. GGG. The Bank presented the certificates of satisfaction to evidence that Starr misrepresented her ownership of Hollythorne on the first personal financial statement. Starr testified that she had no mortgages on Hollythorne and that these were lines of credit that were never used. Her testimony was found to be credible and, therefore, the Court does not believe that Starr's first personal financial statement was false as to the Hollythorne property.

[20] Pl.'s Ex. O.

[21] Pl.'s Ex. M. The third personal financial statement is comprised of a two page document titled "personal financial statement," which utilizes the same form as Starr's second personal financial statement, as well as a document titled "Gray Ridge Estates Present Market Value" and copies of statements from Starr's National City Money Market Savings account and Raymond James account.

of $3,360,933.00, including $125,857.00 in cash, $219,000.00 in marketable securities,[22] $987,273.00 in receivables,[23] $4,345.00 in cash value life insurance, $77,278.00 in vested interest in retirement fund, $10,000.00 in furniture and personal property, $25,000.00 in vehicles, and $1,912,180.00 in real property.[24] The third statement reports total liabilities of $986,322.00 for a net worth of $2,374,611.00. The third personal financial statement also lists Starr's interest in Barrington Framing Company and Homes by Barrington and reports that Starr cosigned a loan for her daughter's car.

There is no dispute that on April 7, 2008, the Bank granted the second extension on the loan which extended the maturity date to October 1, 2008.[25] To obtain the extension, Starr completed the third personal financial statement, discussed above, and Barrington paid a fee of $500.00, reduced by the Bank, required under the terms of the loan for an extension. In addition, Barrington remained current on all payments required under the loan at that time.

Following the second modification of the loan, Defendant testified that she spoke with Chris Starr in June or July of 2008 about the future viability of Gray Ridge. According to Defendant, Chris Starr questioned whether he would receive his principal payment and in response, Defendant offered Chris Starr mortgages on both her Fallen Timber property and the Gray Ridge property. Subsequently, on July 7, 2008, Defendant executed mortgages to Chris Starr on both Fallen Timber and Gray Ridge Estates in the amount of $300,000.00 on each property.[26]

Once October 1, 2008 arrived and Barrington was unable to pay the principal balance of the loan, it stopped making the interest payments on the loan and was in default. Starr testified that she and Duplain had attempted to communicate with the Bank to further extend the maturity date of the loan, but no further extension ever came to fruition. In early April 2009, the Bank and Starr engaged in a series of negotiations via e-mail whereby the Bank offered the following modification to the loan: 1) Extension of maturity date to October 1, 2010; 2) Adjust interest rate to prime plus 1% if modification signed and loan brought current; 3) No future draws on the loan; and

---

[22] Defendant reports her Raymond James account as her only marketable security. The statement from Raymond James attached by Starr reports a current value in her investment account of $200,528.91. On the Raymond James statement, Starr has handwritten a note address to Mark (which the court concludes is Mark Nicholson from Advantage Bank) stating that she "picked up the total from the previous" statement to apparently explain the difference from the third personal financial statement and the Raymond James statement.

[23] Defendant reports receivables of $150,000.00 from R R Stark, $69,700.00 from Homes by Barrington, $200,000.00 from W. Gray, and $567,573.00 from Barrington Framing.

[24] Starr listed real property of 1725 Fallen Timber valued at $310,000.00, Gray Ridge with a net value of $1,499,816.00 (total value of $3,169,460.00 less liabilities of $802,071.00 to Advantage Bank, $300,000.00 to Chris Starr, and $567,573.00 to Irene M. Starr Trust), 2740 Gray Ridge (model home) with a net value of $43,000.00 (total value of $175,000.00 less liability of $132,000.00), and 2782 Gray Ridge (spec home) with a net value of $33,900.00 (total value of $169,900.00 less liability of $136,000.00). The total value of all the real property combined is $3,824,360.00 and the total liabilities on the real property are $1,937,644.00. Thus, the net value of the real property is $1,886,716.00. It is unexplained why Starr listed a net value of the real property as $1,912,180.00 and why the Bank did not question this discrepancy either then or at trial.

[25] Pl.'s Ex. P.

[26] Pl.'s Ex. I and J and Def.'s Ex. 4-004 to 4-006.

6

4) Additional collateral offered consisting of assignment and security interest of Starr's Raymond James Account.[27] Starr counteroffered the Bank's modification as follows: 1) Extension of maturity date to April 7, 2011, 2) Loan brought current at 7.5% interest, but waiver of all late fees and default interest, and 3) No additional collateral offered due to flawless payment history.[28] The Bank refused to accept Starr's counteroffer.

Starr testified that she countered the Bank's modification proposal and contacted Raymond James to request the cash out of her retirement account. Starr testified that in order to close any new deal with the Bank, at a minimum, Barrington would have to bring the loan current, which required cash. Starr's intent in cashing out her Raymond James account was to fund the new modification with the Bank. By the time Starr received the cash from Raymond James, the Bank had already rejected her counteroffer and Starr realized that Barrington and the Bank would not reach an agreement on a new modification. Starr testified that, realizing the dismal future of Gray Ridge, she paid Chris Starr the balance of the Raymond James account in the amount of $117,307.61.[29] Starr testified that she sought to pay the principal owed to a creditor with the money and that if she paid the Bank the money would predominantly go toward fees and interest, not principal. Starr also testified that she believed the Bank would be repaid from the value in the Gray Ridge property. In accord with Starr's testimony is the Bank commissioned appraisal of Gray Ridge on March 11, 2009 which valued the property at a total of $1,463,000.00.[30] Thus, Starr's testimony that she believed that the Bank was sufficiently secured to be repaid in full is entirely credible as is the explanation regarding a desire to pay down principal.

On April 24, 2009, the Bank obtained a judgment against Barrington Framing, Starr, and Duplain in the sum of $779,782.06 plus interest of 12% from October 1, 2008 plus late charges equal to 5% of the unpaid portion of the regularly scheduled payments and for the costs of the action.[31] On October 1, 2009, Starr filed for relief under chapter 7 of the Bankruptcy Code.

Ultimately, only six lots of the eighty-six lots were ever sold. Of those six lots, three lots were used for custom homes and the other three were spec homes. After the commencement of this adversary proceeding, Gray Ridge was sold at Sheriff's sale for $227,392.56.

For purposes of clarity, the following is a timeline of the main facts of this case:

| | |
|---|---|
| Prior to July 2005: | Starr purchased Gray Ridge. |
| July 13, 2005: | Starr submitted her first personal financial statement to the Bank. |
| October 12, 2005: | The Bank furnished a line of credit to Barrington in the amount of $975,000.00 with Starr and Duplain as guarantors. |
| Early 2006: | Project was stalling due to delays by the City of Massillon and the Bank. |

---

[27] Defendant's Exhibit 9 documents a series of e-mails between the Bank and Starr and contains the Bank's proposed modification of the loan. Plaintiff's Exhibit SS documents the Bank's e-mail of April 1, 2009 to Starr.
[28] Def.'s Ex. 9.
[29] Def.'s Ex. 11.
[30] Def.'s Ex. 10.
[31] Pl.'s Ex. HH.

| | |
|---|---|
| May 2006: | Starr created the Trust and placed Fallen Timber and all personal property into it. |
| July 2006: | Barrington and the Bank met regarding the possibility of additional funds being necessary for the project. |
| September 2006: | The Bank requested that Barrington contribute an additional $450,000.00, as these funds are needed to complete the project. |
| September 25, 2006: | Barrington borrowed $450,000.00 from Chris Starr and Starr and Duplain signed a promissory note to Chris Starr as representatives of Barrington. |
| June 1, 2007: | Starr submitted her second personal financial statement to the Bank. |
| June 2007: | Starr sold Hollythorne for $300,000.00 and repaid Chris Starr $150,000.00. |
| Late July 2007: | Barrington drew $154,809.53 on the line of credit. |
| September 18, 2007: | The Bank granted the first extension on the loan. |
| March 2008: | Starr submitted her third personal financial statement to the Bank. |
| April 7, 2008: | The Bank granted the second extension on the loan. |
| July 7, 2008: | Starr executed mortgages to Chris Starr on Fallen Timber and Gray Ridge. |
| October 1, 2008: | The loan reached maturity and Barrington stopped making interest payments. |
| April 2009: | The Bank and Starr attempted to negotiate a further extension of the loan and Starr cashed her Raymond James account. |
| April 10, 2009: | Starr paid the balance of her Raymond James account to Chris Starr. |
| April 24, 2009: | The Bank obtained judgment against Barrington, Starr, and Duplain. |
| October 1, 2009: | Starr filed for relief under chapter 7 of the Bankruptcy Code. |
| June 2011: | Gray Ridge sold at Sheriff's sale. |

This case can be summarized as follows: Plaintiff accuses Defendant of being evil. Defendant accuses Plaintiff of being unreasonable or worse. After weighing the evidence and testimony and credibility, the Court concludes that both were, to varying degrees, incompetent and inattentive, and that neither was evil.

## **CONCLUSIONS OF LAW**

A creditor seeking a judgment of nondischargeability must prove each of the elements of its complaint by a preponderance of the evidence. *See* Grogan v. Garner, 498 U.S. 279, 291 (1991). Exceptions to discharge are construed strictly against the creditor. Rembert v. AT&T Universal Card Servs. (In re Rembert), 141 f.3d 277, 281 (6th Cir. 1998) (citation omitted).

    I.    Nondischargeability Pursuant to 11 U.S.C. § 523(a)(2)(B)

Under 11 U.S.C. § 523(a)(2)(B), a debt is nondischargeable if credit or an extension or renewal of credit was obtained by

    (B) use of a statement in writing—
        (i) that is materially false;
        (ii) respecting the debtor's or an insider's financial condition;

>   (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and
>
>   (iv) that the debtor caused to be made or published with intent to deceive.

Id.; see St. Mary's Cement Co. v. Leach (In re Leach), Case No. 08-60100, Adv. No. 08-6046, 2009 Bankr. LEXIS 1435, at *22 (Bankr. N.D. Ohio Mar. 26, 2009); accord Fahey Bank v. Benton (In re Benton), 367 B.R. 592, 596 (Bankr. S.D. Ohio 2006); Carson v. Chamberlain (In re Chamberlain), 330 B.R. 195, 203 (Bankr. S.D. Ohio 2005).

Defendant does not dispute that all three personal financial statements constitute statements in writing or that the statements respected her financial condition. In addition, Defendant acknowledges that she made mistakes when completing the financial statements. Specifically, Defendant admits in her post-trial brief that she "mistakenly listed her personal residence and her Raymond James Account in her name rather than in her revocable trust." There is no dispute that the second and third personal financial statements were materially false.[32] The remaining issues are, therefore, whether the Bank reasonably relied on the statements and whether Defendant caused the statements to be made with the requisite level of intent.

   A. *Reasonable Reliance*

Reasonable reliance under 11 U.S.C. § 523(a)(2)(B) "is a factual determination to be made in light of the totality of the circumstances." Bank One, Lexington, N.A. v. Woolum (In re Woolum), 979 F.2d 71, 75 (6th Cir. 1992); accord Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163, 1166-67 (6th Cir. 1985) (courts must consider all facts and circumstances of the case, including the size of the loan). Courts consider the issues of reasonable reliance as two questions: 1) whether the creditor relied on the materially false financial statement; and 2) whether that reliance was reasonable. Nat'l City Bank v. Plechaty (In re Plechaty), 213 B.R. 119, 126 (B.A.P. 6th Cir. 1997).

Reasonable reliance is a higher standard than that of "justifiable reliance," the standard for § 523(a)(2)(A) claims. In re Oster, No. 11-1388, 2012 U.S. App. LEXIS 6247, at 6 (6th Cir. Mar. 26, 2012); accord Huntington Nat'l Bank v. Moore (In re Moore), Case No. 08-11498, Adv. No. 08-1163, 2009 Bankr. LEXIS 1887, at 10 (Bankr. N.D. Ohio July 2, 2009). There are five factors that may affect the reasonableness of a creditor's reliance:

>   (1) Whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have

---

[32] The Bank argues that the first statement was false because it failed to list mortgages on the Hollythorne property but the Court found Starr's testimony to be credible that were no mortgages on the Hollythorne property when Starr submitted the first statement. Thus, the first statement was not materially false.

9

revealed the inaccuracy of the debtor's representations.

Oster, 2012 U.S. App. LEXIS 6247 at 6-7 (quoting BankBoston Mortg. Corp. v. Ledford (In re Ledford), 970 F.2d 1556, 1560 (6th Cir. 1992)). "Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) 'cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bath faith.'" Woolum, 979 F.2d at 76, (quoting Martin, 761 F.2d at 1166-67).

To satisfy the first prong of reasonable reliance, the Bank offered much testimony that its representatives relied on Starr's personal financial statements when granting both of the loan modifications to extend the maturity date of the loan. Defendant does not dispute that the Bank relied on the personal financial statements, but argues that its reliance was not reasonable.

The reasonableness of the Bank's reliance is highly doubtful. The Court is unaware of whether the Bank made any independent inquiries regarding Starr's finances or creditworthiness. While a creditor does not generally have affirmative duty to verify the accuracy of information contained in a financial statement, a creditor's reliance on a financial statement is only reasonable if the financial statement is "complete and contains no apparent inconsistencies." John Deere Co. v. Myers (In re Myers), 124 B.R. 735, 743 (Bankr. S.D. Ohio 1991). The Bank contends that the second personal financial statement was materially false because 1) it failed to list the Fallen Timber property as Starr's rather than as property of the Irene M. Starr Trust and 2) it failed to list the loan to Chris Starr. The Bank also contends that the third personal financial statement was materially false because it listed the Fallen Timber property as Starr's rather than as property of the Irene M. Starr Trust.

When viewing the second and third personal financial statements against the first personal financial statement, it is clear that Starr had some significant changes in her personal finances. First, her first personal financial statement listed an interest in the Hollythorne property ($385,445.00) and an interest in I.M. Starr, Inc. ($496,003.00), both of which were absent from her second and third personal financial statements. Second, her first personal financial statement valued the Fallen Timber property at $143,804.00, while the second and third personal financial statements valued this property at $310,000.00, an increase of $166,196.00. Finally, her receivables increased from $525,478.00 on the first personal financial statement to $908,503.00 on her second personal financial statement (an increase of $383,205.00) and $987,273.00 on her third personal financial statement (an increase of $78,770.00). Moreover, the third personal financial statement contained inconsistent information regarding the value of the real property that Starr reports as discussed above.

These inconsistencies constitute "red flags" that indicated additional investigation was warranted. At the time that Starr completed the second and third personal financial statements, the Gray Ridge project was failing. The Bank exercised the option to extend the loan because the lots were not selling and it knew that Barrington could not pay the principal on the loan without sales. It makes no sense why the Bank did not investigate the disposition of the Hollythorne property or I.M. Starr, Inc. These assets were significant to Starr's net worth on her first personal

10

financial statement and the Bank should have at least questioned their disappearance. In addition, the court cannot comprehend why the Bank accepted Starr's report that her Fallen Timber property had increased in value by $166,196.00 during a time when many properties were declining in value. In fact, had the Bank questioned the increase in value, it may have discovered that Starr had assigned the Fallen Timber property to her Trust and could have investigated the effect of the Trust on its rights at that time. In addition, the second and third personal financial statements listed the Trust, which put the Bank on notice of its existent. Moreover, the Bank does not explain why the Trust was fraudulent. There was no testimony that putting property into a revocable trust at that time placed it beyond the reach of creditors. *See* O.R.C. § 5805.06(A)(1) ("During the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors.").

Moreover, the court is perplexed why the Bank did not investigate the addition of approximately $400,000.00 in receivables, including from whom the receivables were due and the nature of the receivables. Receivables, being speculative in a sense, require some inquiry to determine the validity of them as an asset. These inconsistencies when viewed together are significant and should have raised the Bank's awareness that the personal finance statements may contain false information. Even minimal investigation by the Bank would have revealed these inaccuracies.

In addition, the Bank did not have a significant past relationship with Starr. At the time that Starr completed the second personal financial statement, Starr's previous dealings with the Bank consisted of the application process of the loan, including her first personal financial statement, and approximately two (2) years of regular interest payments, made by Barrington, toward the loan. These few business dealings and relatively short relationship can hardly be described as giving rise to a relationship of trust. In addition, the Bank argued, and had representatives testify, that Starr was unhappy with it and its representatives at various points in the relationship and that Starr used profanities toward Bank representatives. Starr's demeanor, as described by the Bank, does not lead the Court to conclude that the Bank should have trusted Starr.

Other factors also indicate that the Bank's reliance was not have been reasonable. The loan to Starr was substantial, with a maximum draw amount of $975,000.00. *See* Martin, 761 F.2d at 1166. Further, the Bank did not provide the Court with any information on its standard lending policies for loans of this size. *See* Moore, 2009 Bankr. LEXIS 1887, at 12 (finding no reasonable reliance where creditor did not provide court with information on its standard lending practices). The only evidence that the Bank provided relevant to the reasonable reliance inquiry was Starr's personal financial statements and testimony from Bank representatives that the Bank relied on the personal financial statements. The Court has serious doubts as to the Bank's practices. The overwhelming impression is that no one was paying much attention to this loan for reasons that were never discussed. Papers were received and dutifully stuffed into the file.

In addition, the loan was made to Barrington Framing with Starr and Duplain as guarantors. This is of import because the Bank was simultaneously looking at the financial statements of Barrington Framing and Duplain, as well as Starr's, when making determinations

11

whether to extend the maturity date of the loan. Finally, when extending the maturity date of the loan twice, in each instance, the Bank knew that Barrington Framing could not pay the principal of the loan without sales of the Gray Ridge lots and it was aware of the dismal sales in Gray Ridge. Its options were either to refuse the modifications and place the loan in default or grant the modifications, thereby extending the maturity dates, and hope, just like Starr, that sales would be made.

While Starr may have omitted her personal guaranty of the loan to Chris Starr on her second personal financial statement, that loan was not omitted on her third personal financial statement. The Bank did nothing with that information when it appeared on the third personal financial statement. The Court believes that the Bank would not have done anything differently with the second personal financial statement even if Starr had listed the loan to Chris Starr on it.

Given all of the foregoing circumstances and especially the credibility of the witnesses, the Court concludes that the Bank's reliance on the personal financial statements was not reasonable.

B. *Intent to Deceive*

A creditor must establish an intent to deceive by a preponderance of the evidence. Moore, 2009 Bankr. LEXIS 1887, at 13 (citing Midwest Cmty. Fed. Credit Union v. Sharp (In re Sharp), 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007)). A creditor can establish the element of intent to deceive by showing both that the debtor had some duty to provide the creditor with the financial statement and that the debtor either intended the statement to be false or that the statement was grossly reckless as to its truth. Martin, 761 F.2d at 1167; *accord* Oster, 2012 U.S. App. LEXIS 6247, at 12-13. "It is not uncommon that intent to deceive must be established by circumstantial evidence and by way of inference." Oster, 2012 U.S. App. LEXIS 6247, at 13 (quoting Thord Credit, Inc. v. Carmen (In re Carmen), 723 F.2d 16, 19 (6th Cir. 1983) (Wellford, J., dissenting)). A creditor has met its burden if it can show that the debtor was reckless when submitting financial statements that he knows are not true. Moore, 2009 Bankr. LEXIS 1887, at 13 (citing Investors Credit Corp. v. Batie (In re Batie), 995 F.2d 85, 90 (6th Cir. 1993)). If the court can infer honest intent, the question of nondischargeability must be construed in the debtor's favor. Fifth Third Bank v. Collier (In re Collier), 231 B.R. 618, 626 (Bankr. N.D. Ohio 1999).

It is only the omission of the loan owed to Chris Starr that makes the question of intent to deceive difficult in this case. The other false statements were not so significant that, if represented correctly, they would have altered the Bank's decision to extend credit to Barrington. Specifically, Starr's failure to list her Fallen Timber property as owned by her Trust, while troublesome, is not sufficient to show an intent to deceive. Given that the Trust did not protect its assets from Starr's creditors and Starr, as trustee, could remove the assets from the Trust, Starr's interest in those assets and her creditors' rights to obtain those assets through collections was essentially unchanged.

Starr did not appear to this Court to be a dishonest debtor. Although one would expect Starr to be able to fill out the personal financial statement properly with accurate information by

listing the loan to Chris Starr and the property in her Trust, her failure to do so does not indicate an intent to deceive. Rather, it indicates poor business acumen. Her obvious inattentiveness to details may explain both the mistakes in her personal financial statements, as well as the failure of her business venture.[33] Neither the evidence or Starr's demeanor or statements while under oath, indicated any intent on Starr's part to deceive the Bank. She was generally credible. Her excuses are found to be believable. The Bank has not met its burden of proof by a preponderance of the evidence that Starr intended to deceive the Bank in her personal financial statements.

Having found that two of the elements required for nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(B) were not met, the Court finds in favor of Starr as to this count of the complaint.

II. Nondischargeability Pursuant to 11 U.S.C. § 523(a)(2)(A)

Under 11 U.S.C. § 523(a)(2)(A), a debt is nondischargeable if credit or an extension or renewal of credit was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

> In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

Rembert, 141 F.3d at 280-81. The creditor must prove all elements by a preponderance of the evidence in order to except a debt from discharge. Id. at 281 (citing Grogan, 498 U.S. at 291). Exceptions to discharge are construed strictly against the creditor. Rembert, 141 F.3d at 281 (citing Mfr's Hanover Trust v. Ward (In re Ward), 857 F.2d 1082, 1083 (6th Cir. 1988)).

The Bank premises its argument for nondischargeability under § 523(a)(2)(A) on its allegation that Starr told the Bank, through its representatives, that she personally contributed the $450,000.00 into Barrington Framing in September 2006 when, in fact, Barrington had actually borrowed the $450,000.00 from Chris Starr. Several of the Bank's representatives testified at trial to this effect. However, the Court is not convinced that Starr ever made this representation. The Bank never asked for proof, either from Barrington or from Starr, of where the funds derived. The Bank did not provide any evidence, aside from the testimony, that it believed that Starr personally contributed these funds. Nor was there any other form of corroboration. As discussed in the findings of fact above, the Bank knew or should have known that Barrington borrowed the $450,000.00 based on the fact that Starr did not have liquid assets sufficient to contribute that amount of money. Thus, it has not been established that Starr made a

---
[33] As proof of Starr's poor business sense, the Court references Starr's testimony where she indicated that both she and Duplain signed the promissory note for the loan without reading the documents and, therefore, neither knew that the loan contained a minimum interest rate of 7.5%, contrary to their belief.

13

misrepresentation. Moreover, without very specific language from the alleged conversations, it would be difficult to parse the accuracy of the specific, alleged misrepresentation. Accordingly, the Bank has not met its burden of proof as to the first element for a claim of nondischargeability pursuant to § 523(a)(2)(A) and, therefore, nondischargeability pursuant to § 523(a)(2)(A) is not appropriate.

Having found that Starr did not make a misrepresentation, the Court will not review the remaining elements for nondischargeability pursuant to § 523(a)(2)(A).

III. Nondischargeability Pursuant to 11 U.S.C. § 523(a)(6)

Under 11 U.S.C. § 523(a)(6), a debt is excluded from discharge if the debt is "for willful and malicious injury by the debtor to another entity or to the property of another entity." A creditor "must prove by a preponderance of the evidence that the injury from which the debt arises was both willful and malicious." Transp. Equip. Sales Corp. v. Hahn (In re Hahn), Case No. 09-37597, Adv. No. 10-3041, 2011 Bankr. LEXIS 2979, at 17 (Bankr. N.D. Ohio July 29, 2011) (citing Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 463 (6th Cir. 1999)).

A willful injury is one "where the debtor 'desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it.'" Ewers v. Cottingham (In re Cottingham), 473 B.R. 703, 709 (B.A.P. 6th Cir. 2012) (quoting Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464 (6th Cir. 1999)). The injury itself must be deliberate or intentional, not just a deliberate or intentional act that leads to injury. Musilli v. Droomers (In re Musilli), 379 Fed. Appx. 494, 498 (6th Cir. 2010) (quoting Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998)). The Sixth Circuit has developed a non-exclusive list of "types of misconduct [that] satisfy the willful and malicious injury standard: intentional infliction of emotional distress, malicious prosecution, conversion, assault, false arrest, intentional libel, and deliberately vandalizing the creditor's premises." Musilli, 379 Fed. Appx. at 498 (quoting Steier v. Best (In re Best), 109 F. App'x 1, 5 & n.2 (6th Cir. 2004)).

In addition to proving a "willful" injury, the creditor must also prove that the debtor acted maliciously. "Malicious injury means an injury caused in 'conscious disregard of one's duties or without just cause or excuse.'" Cottingham, 473 B.R. at 709 (quoting Wheeler v. Laudani, 783 F.20 610, 615 (6th Cir. 1986)); accord Hahn, 2011 Bankr. LEXIS 2979, at 19. "[U]nless the actor desires to cause consequences of his act, or … believes that the consequences are substantially certain to result from it, . . . he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." Id. at 18 (quoting Markowitz, 190 F.3d at 464).

The Bank contends that Starr willfully and maliciously injured it when she cashed her Raymond James account and subsequently paid the entire proceeds of it to Chris Starr rather than to it. The Court does not believe that Starr's actions in paying the proceeds to Chris Starr, rather than to the Bank, rise to the level of willful and malicious. Starr testified that she cashed out the Raymond James account because she believed that Barrington and the Bank would be able to reach an agreement on a third modification of the loan and that she would need the funds from the

14

Raymond James account to fulfill Barrington's part in the modification. The negotiation of the terms of the modification support this testimony. Starr also testified that in the time between her request to cash out the Raymond James account and the receipt of the funds, negotiations between Barrington and the Bank fell apart. Starr wanted to use the money to pay toward principal owed, rather than interest and fees, so she paid Chris Starr the funds received from her Raymond James account. Starr's testimony and timeline is believable and does not indicate that she acted maliciously in paying Chris Starr instead of the Bank.

Further, the Bank did not establish that Starr believed that by paying Chris Starr, instead of the Bank, that substantial harm was certain to result to the Bank. The Bank contends that Starr knew that substantial harm would result because the Bank would not be able to collect the funds from the Raymond James account. However, Starr testified that the Bank still had a security interest in the Gray Ridge property and that she believed that the Bank would receive its money from that property. The Bank argues that, since the Gray Ridge property later sold for just $227,392.56, Starr's testimony is not credible. The Court does not agree. According to Starr's testimony, she relied on several appraisals of the Gray Ridge property commissioned by the Bank well in excess of $1 million while the loan to Barrington was under $1 million. Even if the lots had to be sold for these appraisals to be realized, there is no reason to believe that Starr believed that the Gray Ridge property, which she had bought for over $250,000.00 and developed significantly during the project, would sell for just $227,392.56.

Based on the foregoing, the Bank has not established that Starr acted willfully and maliciously and, therefore, a finding of nondischargeability pursuant to § 523(a)(6) is not appropriate.[34]

IV. Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(4)(A)[35]

Pursuant to 11 U.S.C. § 727(a)(4)(A), "[t]he court shall grant the debtor a discharge, unless—the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account." "[A] plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." Keeney v. Smith (In re Keeney), 227 F.3d 679, 685 (6th Cir. 2000). "Intent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." Id. A debtor is entitled to discharge if "false information is the result of mistake or inadvertence." Id. at 686. "The subject of a false oath is material if it 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" Id. at 686 (citing Beaubouef v. Beaubouef (In Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992)).

---

[34] The Court need not address the legal issue of whether an action such as this would qualify as the basis for § 523(a)(6) violation.
[35] Pursuant to the Bank's post-trial brief, it is only pursuing a denial of discharge pursuant to § 727(a)(4)(A).

15

The Bank contends that Starr made the following false oaths in her bankruptcy petition:

- Failed to disclose a Charter One Savings Account
- Falsely stated the value of the Irene M. Starr Trust was zero
- Falsely stated she had made no transfers of property in the last two years, other than property transferred in the ordinary course of her business or financial affairs
- Falsely stated she made no transfers to a self-settled trust in the last 10 years
- Falsely stated the only bank account she had closed in the last year was a National City checking account
- Falsely stated she had issued no personal financial statement in the last two years, despite issuing at least one to the Bank
- Falsely stated she would retain her home at 1725 Fallen Timber and "pay pursuant to contract," but has not paid anything to Chris Starr

With one exception, there is no dispute that these statements were made under oath by Starr, were false, and were arguably materially related to the bankruptcy case.

The only exception is that Starr did not fail to disclose a Charter One Savings Account. The Bank introduced statements from Charter One that show that Starr held four (4) accounts at Charter One: two (2) checking accounts, one (1) money market account, and one (1) savings account.[36] In contrast, Schedule B of her petition reports that Starr had three (3) Charter One accounts at the time of filing: two (2) checking accounts and one (1) money market account. The Bank refers to the missing savings account as a false oath by Starr. However, the statements produced are dated from July 2008 through December 2008, while Starr filed bankruptcy on October 1, 2009 a year later. These statements clearly do not evidence that Starr held the savings account as of the petition date. Thus, the Bank failed to establish a false oath with respect to the Charter One savings account.

With respect to the other allegations of false oath, the only remaining elements that the Bank must satisfy are whether Starr knew the statements were false and whether Starr made these false statements with an intent to defraud.

*A. Knowledge that Statements were False*

The Court is not convinced that Starr knew that any of the above oaths were false. As evidenced by Starr's testimony at trial, she clearly lacked the financial acumen necessary to understand her financial transactions with specificity. For example, when it was in her best interest to know the interest rate on the loan from the Bank, Starr failed to read the promissory note and did not understand that the loan carried a minimum interest rate. The Court would not expect that Starr suddenly became more astute about her finances when filing bankruptcy.

Specifically, with respect to the statements that relate to Starr's Trust and its assets, the Court would not expect that Starr understood the ramifications to the ownership of her property by

---

[36] Pl. Ex. AA.

16

creating a revocable, self-settled trust and transferring assets to it. When filing bankruptcy, she listed her assets that she had placed in the Trust and listed the Trust on her schedules. She clearly was not aware that the assets were now owned by the Trust and not by her personally. Further, Starr testified that she told her attorney the information and this is the way the attorney completed the schedules with respect to her Trust. Starr inaccurately scheduled the assets, but the Court does not believe it was done with the knowledge that it was inaccurate. The Court also believes that Starr did not understand the correlation between her completion of the personal finance statements to the Bank with the question on the statement of financial affairs relating to these statements. There is no evidence that Starr knew she answered that question falsely.

In addition, while the Bank established that Starr has not made regular payments to Chris Starr for the mortgage on the Fallen Timber property, there is no evidence that Starr knew she would not make the payments as of the petition date. Further, there is no evidence that "pay pursuant to the contract" requires Starr to make regular payments on the mortgage. Absent evidence that Starr was required to make payments to Chris Starr on the mortgage and that she knew she would not make those payments, there is no proof that Starr knew this statement was false.

*B. Fraudulent Intent*

The Bank presented no evidence regarding Starr's intent when making these false statements. During the trial, the Bank did not even reference its § 727 claim with respect to Starr's intent.[37] The testimony at trial which related to intent almost exclusively focused on Starr's intent regarding the personal financial statements. The Bank did not introduce any evidence of Starr's intent as to her petition and schedules. While the Bank's complaint seeks a denial of discharge pursuant to 11 U.S.C. § 727(a)(2) through (7), its post-trial brief specifically states that the Bank is only pursuing a denial of discharge under § 727(a)(4)(A). Moreover, the Bank's argument in its post-trial brief related to its § 727 allegations are limited to just one page. Half of that page is a statement of case law on § 727(a)(4)(A) and the other half is an enumeration of the misrepresentations and omissions that the Court has set forth above. There is no argument regarding intent in relation to § 727(a)(4)(A) in its post-trial brief. The Bank clearly argued its § 727 claim as an afterthought, thrown in for good measure.[38]

Further, the Court finds the false statements to be the result of mistake or inadvertence. For example, Starr falsely listed the value of the Trust as zero when it contained the Fallen Timber property and all of her personal property. Starr, however, listed the Fallen Timber property on Schedule A and listed her personal property on Schedule B. This indicates to the Court that Starr was mistaken about how she owned this property in conjunction with the Trust. The fact that she listed all the assets of the Trust as if she owned them does not indicate an intent by Starr to conceal

---

[37] The only testimony at trial related to its § 727 claim were Starr's identification of her petition and schedules that evidence the alleged false oaths. No questions were asked regarding her knowledge of the oaths or her intent when making the oaths.

[38] In fact, it was such a non-issue at trial that Defendant did not even brief her argument against a finding of § 727(a)(4)(A) in her post-trial brief. The Bank did not file a pretrial brief. Thus, this issue appeared to be abandoned.

17

assets.  This is just a further example of Starr's lack of financial acumen.  Another similar example is Starr's failure to list a closed savings account with Charter One.  Like the interest rate on the loan by the Bank, Starr was not concerned by the details, either large or small, of her finances.  Starr's lack of financial acumen alone does not evidence any fraudulent intent.

Moreover, none of the undisclosed items formed part of any scheme to mislead the chapter 7 trustee, creditors, or the Court.  In fact, these false oaths were of no consequence to the bankruptcy estate.  For example, while Starr inaccurately scheduled the Trust and its assets, all of the assets were reported nonetheless.  Starr's financial situation was bound to be the same with or without these errors, oversight, and obvious inattention that is so common in petitions and schedules.  The fact that she was similarly careless when the lack of care was to detriment is telling.

Accordingly, a denial of Starr's discharge pursuant to 11 U.S.C. § 727(a)(4)(A) is not warranted.

An order will be entered simultaneously with this opinion.

#     #     #

**Service List:**

John L. Chaney
Ray P. Drexel
One E. Livingston Avenue
Columbus, OH 43215-5700

Anthony J DeGirolamo
116 Cleveland Ave., N.W.
Suite 307
Canton, OH 44702

James M McHugh
Tzangas, Plakas, Mannos & Raies, Ltd.
220 Market Avenue, South
Eighth Floor
Canton, OH 44702

Irene M Starr
1725 Fallen Timber Street NE
Canton, OH 44721